Filed 5/11/15  (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA et al., <br><br> Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF LOS ANGELES COUNTY, <br><br> Respondent; <br><br>───────────── <br><br> COUNTY OF LOS ANGELES et al., <br><br> Real Parties in Interest. | B259392 <br><br> (Los Angeles County Super. Ct. No. BS143004) <br><br> ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on May 6, 2015, be modified as follows:

On page 2, the first paragraph should be deleted and replaced with the following:

Collins Collins Muir + Stewart, Eric Brown, Tomas A. Guterres and James C. Jardin for Real Parties in Interest County of Los Angeles and the Los Angeles Sheriff's Department.

Katie Townsend for the Reporters Committee for Freedom of the Press and 4 Media Organizations as Amici Curiae on behalf of Petitioners.

James R. Wheaton and Cherokee D.M. Melton for Northern California Chapter of Society of Professional Journalists as Amicus Curiae on behalf of Petitioners.

Jones & Mayer, Martin J. Mayer, James R. Touchstone and Deborah Pernice Knefel, for the California State Sheriffs' Association, California Policy Chiefs' Association, and the California Peace Officers' Association as Amici Curiae on behalf of Respondent.

There is no change in the judgment.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA et al., <br><br>     Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF LOS ANGELES COUNTY, <br><br>     Respondent; <br><br> ──────────────── <br><br> COUNTY OF LOS ANGELES et al., <br><br>     Real Parties in Interest. | B259392 <br><br> (Los Angeles County <br> Super. Ct. No. BS143004) |

PETITION for Writ of Mandate from an order of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Petition denied.

Peter Bibring for Petitioner American Civil Liberties Union Foundation of Southern California.

Jennifer Lynch for Petitioner Electronic Frontier Foundation.

No Appearance for Respondent.

Michael N. Feuer, City Attorney, Carlos De La Guerra, Managing Assistant City Attorney, Debra L. Gonzales, Assistant City Attorney, and Heather L. Aubry, Deputy City Attorney, for Real Parties in Interest City of Los Angeles and the Los Angeles Police Department.

Collins Collins Muir + Stewart, Eric Brown, Tomas A. Guterres and James C. Jardin for Real Parties in Interest County of Los Angeles and the Los Angeles Sheriff's Department.

_____

**INTRODUCTION**

In this writ proceeding we must determine whether the California Public Records Act (CPRA) exemption for law enforcement records of investigations (Gov. Code, § 6254, subd. (f))[1] applies to records generated by a system of high-speed cameras that automatically scan and catalogue license plate images to aid law enforcement in locating vehicles associated with a suspected crime. We conclude the exemption applies.

For more than a decade, the Los Angeles Police Department (LAPD) and Los Angeles Sheriff's Department (LASD), agencies of Real Parties in Interest the City and County of Los Angeles (collectively, Real Parties), have used Automatic License Plate Reader (ALPR) technology to automate a process that officers ordinarily perform manually—checking license plates to determine whether a vehicle is stolen or otherwise wanted in connection with a crime. Real Parties' ALPR systems consist of specialized cameras mounted to patrol cars or stationary structures that scan license plates in their immediate vicinity and record the license plate number together with the time and location of the scan. At virtually the same time, the ALPR system checks every license plate number it scans against a list of known license plates associated with suspected crimes—a so-called "hot list." If the system registers a hit, patrol officers are immediately notified that a hot list vehicle is in their vicinity. Regardless of whether there is a hit, the system records the plate scan data, which Real Parties retain for up to five years for use in future investigations.

---

[1]     Subsequent statutory references are to the Government Code, unless otherwise designated.

Petitioners American Civil Liberties Union Foundation of Southern California and Electronic Frontier Foundation sent Real Parties a CPRA request for their policies and guidelines concerning use of ALPR technology, as well as all ALPR plate scan data Real Parties collected during a single week in August 2012.  Real Parties agreed to produce the policies and guidelines, but refused to disclose the week's worth of ALPR data, citing the law enforcement investigative records exemption and privacy concerns.  Petitioners filed a petition for writ of mandate seeking to compel production of the ALPR data under the CPRA.  The trial court denied the petition, concluding the records are exempt as records of law enforcement investigations under section 6254, subdivision (f).  Guided by Supreme Court precedent extending the exemption to "records of investigations conducted for the purpose of uncovering information surrounding the commission of the violation [of law] and its agency" (*Haynie v. Superior Court* (2001) 26 Cal.4th 1061, 1071 (*Haynie*)), we likewise conclude the exemption applies to records generated by the ALPR system in the course of scanning license plates to locate automobiles associated with a suspected crime under investigation.  Accordingly, we deny the writ petition.

## FACTS AND PROCEDURAL BACKGROUND

The relevant facts are not in dispute.  Real Parties each maintain an ALPR system that consists of several high-speed cameras mounted on fixed structures and patrol cars that automatically capture an image of every passing vehicle's license plate in their immediate vicinity.  The system uses "character recognition software" to read the license plate's number from the image and "almost instantly" checks the number against a list of "known license plates" associated with suspected crimes—or a "hot list"—to determine whether a vehicle may be stolen or otherwise associated with a crime, AMBER alert or outstanding warrant.  If a mobile ALPR unit detects a license plate on the hot list, officers are notified of the "hit" by an audible alert and notation on their patrol car's computer screen.  ALPR fixed positions similarly notify a central dispatch unit when a hit is detected.

3

In addition to extracting the license plate number, the ALPR system records the date and location where it captured the plate's image. The system transmits this "plate scan data" to an ALPR server within Real Parties' confidential computer networks. LAPD estimates it records plate scan data for approximately 1.2 million cars per week; LASD estimates that figure to be between 1.7 and 1.8 million plate scans for its ALPR system. LAPD retains plate scan data for five years under its current policy. LASD retains the data for two years, although it would prefer to retain the data indefinitely.

In addition to receiving immediate notification from the ALPR system when it locates a license plate on the hot list, Real Parties can also query stored plate scan data to assist in subsequent law enforcement investigations. For instance, LAPD investigators have used stored ALPR data to identify a vehicle that was present at an armed robbery and, in another instance, a vehicle directly linked to a homicide. Real Parties maintain policies restricting access to plate scan data for law enforcement purposes only.

On August 30 and September 4, 2012, Petitioners sent substantially identical CPRA requests to LAPD and LASD seeking records related to those agencies' use of ALPR technology, including "all ALPR data collected or generated" during a one-week period in August 2012, consisting of, "at a minimum, the license plate number, date, time, and location information for each license plate recorded." The CPRA request also sought "any policies, guidelines, training manuals and/or instructions on the use of ALPR technology and the use and retention of ALPR data, including records on where the data is stored, how long it is stored, who has access to the data, and how they access the data."

Real Parties each agreed to produce records responsive to Petitioners' requests for policies, guidelines and training manuals concerning the use, access, and retention of ALPR plate scan data. Real Parties refused to produce the requested week's worth of plate scan data, however, citing, among other things, the exemption for records of law enforcement investigations.

On May 6, 2013, Petitioners filed a verified petition for writ of mandate to compel production of the ALPR plate scan data under the CPRA.

4

Real Parties each opposed the petition, again citing the exemption for records of law enforcement investigations under section 6254, subdivision (f), as well as the "catchall" exemption under section 6255.[2]  With their opposition briefs, Real Parties filed supporting declarations by their subject matter experts detailing the technical aspects of their respective ALPR systems and the ways each law enforcement agency uses the technology in practice.

On August 21, 2014, the court held a trial on Petitioners' writ petition.  On August 27, 2014, the court entered an order affirming Real Parties' decision to withhold the ALPR plate scan data, concluding the data was subject to the records of investigations exemption under section 6254, subdivision (f) and the catchall exemption under section 6255.

## DISCUSSION

1.    *Standard of Review*

A trial court order under the CPRA, either directing disclosure by a public official or affirming the public official's decision to refuse disclosure, is immediately reviewable by petition to the appellate court for issuance of an extraordinary writ.  (§ 6259, subd. (c).)  "The standard for review of the order is 'an independent review of the trial court's ruling; factual findings made by the trial court will be upheld if based on substantial evidence.' " (*City of San Jose v. Superior Court* (1999) 74 Cal.App.4th 1008, 1016.)  The interpretation of the CPRA, and application of the statute to undisputed facts is a question of law subject to de novo review.  (*Lorig v. Medical Board* (2000) 78 Cal.App.4th 462, 467.)

---

[2]    Under section 6255, a public agency may justify withholding records otherwise subject to CPRA disclosure requirements by demonstrating that "on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record."

2. *The Records of Investigations Exemption Under Government Code Section 6254, Subdivision (f)*

The CPRA declares that "access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state." (§ 6250.) The statute's explicit purpose is to increase freedom of information by giving the public access to information in the public agencies' possession. (*CBS, Inc. v. Block* (1986) 42 Cal.3d 646, 651.) "Maximum disclosure of the conduct of governmental operations was to be promoted by the [CPRA]." (*Id.* at pp. 651-652.) To that end, the CPRA provides that "every person has a right to inspect any public record, except as hereafter provided." (§ 6253, subd. (a).) Hence, "all public records are subject to disclosure unless the Legislature has expressly provided to the contrary." (*Williams v. Superior Court* (1993) 5 Cal.4th 337, 346 (*Williams*); *Haynie, supra,* 26 Cal.4th at p. 1068.) Consistent with the CPRA's purpose, "[s]tatutory exemptions from compelled disclosure are narrowly construed." (*California State University, Fresno Assn., Inc. v. Superior Court* (2001) 90 Cal.App.4th 810, 831.)

Real Parties contend, and the trial court found, that the plate scan records generated by the ALPR system constitute records of investigations which are exempt from disclosure under section 6254, subdivision (f). In pertinent part, subdivision (f) authorizes a public agency to withhold "[r]ecords of . . . investigations conducted by . . . any state or local police agency, or any investigatory or security files compiled by any other state or local police agency . . . ." While broadly shielding the records themselves from disclosure, the CPRA requires law enforcement agencies to disclose certain information derived from the records, as provided in subdivisions (f)(1) and (f)(2).[3]

---

[3] Notwithstanding the general directive to narrowly construe such exemptions, our Supreme Court has explained that section 6254, subdivision (f) "articulates a *broad exemption* from disclosure for law enforcement investigatory records," which is limited only by requirements in subdivisions (f)(1) and (f)(2) to "provide *certain information derived from the records* about the incidents under investigation." (*Williams, supra,* 5 Cal.4th at p. 349, italics added.) That is, "[i]nstead of adopting criteria that would require the exemption's applicability to be determined on a case-by-case basis," the

(*Williams, supra,* 5 Cal.4th at p. 353; *Haynie, supra,* 26 Cal.4th at p. 1068.)  The parties agree that the derivative categories of information to be disclosed under these subsections—information about arrests and arrestees (§ 6254, subd. (f)(1)) and complaints and requests for assistance (§ 6254, subd. (f)(2))—are not at issue in this case.

What is at issue is the meaning of the term "investigations" in section 6254, subdivision (f), and whether the functions performed by the ALPR system can properly be characterized as investigations under the statute.  Though the CPRA does not define the term, and no case has considered whether records generated by an automated process, like that performed by the ALPR system, qualify for exemption under subdivision (f), our Supreme Court has articulated some general principles to guide our analysis.

First, the exemption for records of investigation encompasses routine investigations undertaken to determine if a violation of law has, or may have, occurred. In rejecting an interpretation that would exclude such records from the exemption's purview, the Supreme Court in *Haynie* explained, "The Court of Appeal, in ordering disclosure, reasoned that the citizen report . . . did not 'necessarily' describe a crime and that the [law enforcement action] was a 'routine police inquiry' based on mere suspicion of criminal conduct. *These factors are of no significance under the statute.*  In exempting '[r]ecords of complaints to, or investigations conducted by' law enforcement agencies, section 6254(f) *does not distinguish between investigations to determine if a crime has been or is about to be committed and those that are undertaken once criminal conduct is apparent*."[4]  (*Haynie, supra,* 26 Cal.4th at p. 1070, fn. 6, italics added.)

---

Legislature "limited the CPRA's exemption for law enforcement investigatory files . . . [by] adopt[ing] a series of amendments that required the disclosure of *information derived from the records* while, in most cases, preserving the exemption for the records themselves."  (*Id.* at p. 353.)

[4]     This distinguishes the records of investigations from "investigatory . . . *files* compiled by any . . . local agency for correctional, law enforcement, or licensing purposes. . . ."  (§ 6254, subd. (f), italics added.)  As the Supreme Court explained in *Williams,* it is "well established that 'information in public files [becomes] exempt as "investigatory" material only when the prospect of enforcement proceedings [becomes] concrete and definite.' "  (*Williams, supra,* 5 Cal.4th at p. 356.)  "Such a qualification is

7

Second, while routine investigations are within the exemption's ambit, not everything that law enforcement does is shielded from disclosure. As the court explained in *Haynie*, "[o]ften, officers make inquiries of citizens for purposes related to crime prevention and public safety that are *unrelated* to either civil or criminal investigations. The records of investigation exempted under section 6254(f) encompass only those *investigations undertaken for the purpose of determining whether a violation of law may occur or has occurred.* If a violation or potential violation is detected, *the exemption also extends to records of investigations conducted for the purpose of uncovering information surrounding the commission of the violation and its agency.*" (*Haynie, supra,* 26 Cal.4th at p. 1071, italics added.)

Third, the exemption shielding records of investigations from disclosure does not lapse when the investigation that prompted the records' creation ends. As the high court stated in *Williams* with respect to the exemption for investigatory files, "It is noteworthy that nothing [in the statute's language] purports to place a time limit on the exemption for investigatory files. Indeed, a file 'compiled by . . . [a] police agency' or a file 'compiled by any other state or local agency for . . . law enforcement . . . purposes' continues to meet that definition after the investigation has concluded. If the Legislature had wished to limit the exemption to files that were 'related to pending investigations,' words to achieve that result were available. It is not the province of courts 'to insert what has been omitted.' " (*Williams, supra,* 5 Cal.4th at p. 357.) The same is true for records of investigations—they continue to be "[r]ecords of . . . investigations conducted by . . . any

necessary to prevent an agency from attempting to 'shield a record from public disclosure, *regardless of its nature*, simply by placing it in a file labelled "investigatory." ' " (*Haynie, supra,* 26 Cal.4th at p. 1069, quoting *Williams,* at p. 355.) However, the " 'concrete and definite' qualification to the exemption in section 6254(f) 'relates only to information which is not itself exempt from compelled disclosure, but claims exemption only as part of an investigatory file. Information independently exempt, such as "intelligence information" [or records of investigations at issue in *Haynie*], is not subject to the requirement that it relate to a concrete and definite prospect of enforcement proceedings.' " (*Haynie,* at p. 1069, quoting *American Civil Liberties Union Foundation v. Deukmejian* (1982) 32 Cal.3d 440, 449, fn. 10.)

8

state or local police agency" even after the investigation that prompted their creation ends. (§ 6254, subd. (f).)

Finally, as alluded to in the foregoing quotation from *Williams*, the Supreme Court has cautioned against courts placing nonstatutory limitations on the scope of section 6254, subdivision (f). As the court elaborated in *Williams*, referring to the required disclosures under section 6254, subdivisions (f)(1) and (f)(2), "These provisions for mandatory disclosure from law enforcement investigatory files represent the Legislature's judgment, set out in exceptionally careful detail, about what items of information should be disclosed and to whom. Unless that judgment runs afoul of the Constitution it is not our province to declare that the statutorily required disclosures are inadequate or that the statutory exemption from disclosure is too broad. . . . Requests for broader disclosure must be directed to the Legislature." (*Williams, supra,* 5 Cal.4th at p. 361.)

With these principles in mind, we turn to whether the plate scan data generated by the ALPR system constitute records of investigation under section 6254, subdivision (f).

3.     *Plate Scan Data Generated by the ALPR System Are Records of Investigations Exempt from Disclosure Under Government Code Section 6254, Subdivision (f)*

Drawing on the guidance from *Haynie* and *Williams*, Real Parties contend the plate scans performed by the ALPR system are "investigations" within the meaning of section 6254, subdivision (f) because they are "conducted for the purpose of uncovering information surrounding the commission of the violation [of law] and its agency." (*Haynie, supra,* 26 Cal.4th at p. 1071.) Citing the declaration by LAPD's subject matter expert, Real Parties stress that the ALPR system uses "character recognition software" to read license plate numbers and "almost instantly" checks those numbers against a list of "known license plate[s]" associated with suspected crimes to "determine whether a vehicle may be stolen or otherwise associated with a crime." The LASD's declarant described the ALPR system's function in similar terms, explaining that by utilizing the system to "automatically" check license plate scans against a "hot list" of plates

9

associated with suspected crimes, "[t]he [LASD] uses ALPR technology to investigate specific crimes that involve motor vehicles, including but not limited to stolen motor vehicles, Amber alerts that identify a specific motor vehicle, warrants that relate to the owner of a specific motor vehicle, and license plates of interest that relate to a specific investigation being conducted by [LASD] investigatory personnel." Thus, Real Parties contend the license plate scan and almost instantaneous check against the hot list constitutes an investigation under section 6254, subdivision (f), because the ALPR system is attempting to detect and uncover criminal activity. (*Haynie,* at p. 1071.)

Expanding on the foregoing analysis, Real Parties argue the records generated by the ALPR system in performing the scans and hot list checks are records of investigations and, therefore, exempt from disclosure under section 6254, subdivision (f). As counsel for the LASD put it at the trial below, plate scan data generated by the ALPR system is necessarily a record of an investigation because "[t]hese records would not exist were the County or the City not investigating specific crimes in an attempt to locate persons who are suspected of having committed crimes." We agree. In the *Haynie* court's words, these records exist only because Real Parties are trying to "uncover[ ] information surrounding the commission of [a] violation [of law] and its agency." (*Haynie, supra,* 26 Cal.4th at p. 1071.) As evidenced by the LAPD and LASD declarations, Real Parties have deployed the ALPR system to assist in law enforcement investigations involving an identified automobile's license plate number. It follows that the records the ALPR system generates in the course of attempting to detect and locate these automobiles are records of those investigations. The exemption under section 6254, subdivision (f) broadly shields these records from disclosure, subject to requirements pertaining to derivative information (see § 6254, subds. (f)(1) & (f)(2)) not at issue here. (See *Williams, supra,* 5 Cal.4th at pp. 353, 361; *Haynie,* at p. 1068.)

Petitioners argue the ALPR plate scans are not investigations within the exemption's purview. Unlike the cases that have applied the exemption, which all "involve[d] requests for documents related to *targeted investigations of specific criminal acts*" (italics added), Petitioners argue the plate scans conducted by ALPR systems "are

10

not precipitated by any specific criminal investigation." Rather, Petitioners assert, ALPR systems "photograph every license plate that comes into view . . . regardless of whether the car or its driver is linked to criminal activity." They contend, ALPR systems "do not conduct investigations; they collect data." We disagree.

Contrary to Petitioners' premise, the plate scans performed by the ALPR system are precipitated by specific criminal investigations—namely, the investigations that produced the "hot list" of license plate numbers associated with suspected crimes. As Real Parties' experts both testified, the ALPR system's principal purpose is to check license plates against the hot list to determine whether a vehicle is connected to a crime under investigation. In this way, the ALPR system replicates, albeit on a vastly larger scale, a type of investigation that officers routinely perform manually by visually reading a license plate and entering the plate number into a computer to determine whether a subject vehicle might be stolen or otherwise associated with a crime.[5] The fact that the ALPR system automates this process does not make it any less an investigation to locate automobiles associated with specific suspected crimes.

Nor does the fact that the ALPR system scans every license plate within view, "regardless of whether the car or its driver is linked to criminal activity," mean the system is not performing an investigation. As explained in *Haynie*, "[i]n exempting '[r]ecords of . . . investigations conducted by' law enforcement agencies, section 6254(f) *does not distinguish between investigations to determine if a crime has been or is about to be committed and those that are undertaken once criminal conduct is apparent*."

---

[5] Petitioners suggest the "collection of plate data"—i.e., the photographing and scanning of a license plate—can be separated from "its later investigative uses"—i.e., the near instantaneous check against the hot list. This argument ignores that the plate scan is an integral part of the ALPR system's process for locating automobiles on the hot list. Just as an officer cannot investigate whether an automobile has been associated with a suspected crime without visually observing and reading its license plate number, so too the ALPR system cannot determine whether a license plate number is on the hot list without scanning the plate. The collection of plate data and hot list check are part and parcel of the same investigative process—without the plate scan there can be no investigation.

11

(*Haynie, supra,* 26 Cal.4th at p. 1070, fn. 6, italics added.) Contrary to Petitioners' implicit contention, our Supreme Court has repeatedly rejected the notion that a "concrete and definite" prospect of enforcement must be shown to exempt records of investigations from disclosure. (*Id.* at pp. 1069-1071; see also *Williams, supra,* 5 Cal.4th at pp. 354-356.) The ALPR system necessarily scans every car in view, just as human officers would in attempting to identify a stolen vehicle. The fact that non-hot list vehicles are necessarily checked does not mean there was no investigation. (See fn. 6, *post.*)

Lastly, Petitioners emphasize the volume and retention of plate scan data to highlight the differences between ALPR scans and more traditional investigative techniques. In Petitioners' view, because Real Parties' ALPR systems each generate more than a million system-wide scans each week, and retain data from these scans for two to five years, they "do not conduct investigations; they collect data."

There are two problems with this argument. We have already discussed the first— the ALPR systems are not merely recording data; rather, Real Parties have deployed these systems primarily to detect and locate vehicles that have been connected to a suspected crime. The fact that ALPR technology generates substantially more records than an officer could generate in manually performing the same task does not mean the ALPR plate scans are not records of investigations.[6]

---

[6] For instance, setting practical considerations aside, Real Parties could hypothetically deploy human patrol units to photograph every license plate they pass during a specific period on a specific route in order to later compare those photographs against a hot list of license plates associated with suspected crimes. Though this tactic would generate a massive number of license plate photographs, of which very few could be expected to appear on the hot list, no one could claim these photographs, and the associated time and location data logged by the officers, were not records of the investigations these officers performed. The fact that the ALPR system automates this process and generates exponentially more records than officers could humanly produce has no bearing on whether those plate scans and associated data are records of investigations under section 6254, subdivision (f).

Second, though ALPR data is retained for two to five years after the initial hot list check, this does not strip an investigative record of its exempt status under section 6254, subdivision (f). As our Supreme Court explained in *Williams*, "nothing [in the statute's language] purports to place a time limit on the exemption for investigative files." (*Williams, supra,* 5 Cal.4th at p. 357.) Records generated by the ALPR system for the purpose of locating automobiles associated with a suspected crime, like the investigative files discussed in *Williams*, continue to meet the applicable statutory definition even after the investigations for which they were created conclude—that is, they continue to be "[r]ecords of . . . investigations conducted by . . . any state or local police agency." (§ 6254, subd. (f); see *Williams,* at p. 357.) Thus, for our purposes in interpreting the exemption, it is of no moment that Real Parties retain the records in a database for years after the initial hot list check.

To be sure, the automated nature of the ALPR system, with its capacity to capture and record millions of plate scans throughout Los Angeles City and County, sets it apart from the traditional investigatory techniques that courts have considered in earlier cases addressing the scope of the investigative records exemption. But that distinction is irrelevant to the question of whether the ALPR system's core function is to "uncover[ ] information surrounding the commission of the violation [of law] and its agency"—i.e., to investigate suspected crimes. (*Haynie, supra,* 26 Cal.4th at p. 1071.). We conclude that it is, and that the records generated in the course of performing that function are records of these investigations. The investigative records exemption applies and shields the plate scan data from disclosure under the CPRA.

Because we conclude the exemption under section 6254, subdivision (f) supports Real Parties' decision to withhold the ALPR plate scan data, we do not address whether Real Parties also met their burden under section 6255's catchall exemption.

13

**DISPOSITION**

The petition for writ of mandate is denied.  Real Parties are entitled to recover their costs in this writ proceeding.

**CERTIFIED FOR PUBLICATION**


KITCHING, Acting P. J.

We concur:


ALDRICH, J.


EGERTON, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14